**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 14-CR-149-GKF |
| ) | |
| JESSICA LYNN NEALIS, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Before the court is the Motion to Suppress [Dkt. #16] of defendant Jessica Lynn Nealis. Nealis moves to suppress evidence obtained during the warrantless search of her purse and vehicle by hotel staff and law enforcement officials with the Eastern Shawnee Tribe of Oklahoma.

**I.   BACKGROUND**

On the night of August 14, 2014, Nealis was a registered guest at the Indigo Sky Casino and Hotel ("Indigo Sky" or "the hotel"). She had reserved a room for one night, and her receipt noted a checkout time of 12:00 p.m. The Indigo Sky is located on trust land belonging to the Eastern Shawnee Tribe of Oklahoma, a federally recognized Indian tribe. The Tribe owns and operates the hotel and has "clothed [it] with all the privileges and immunities of the Eastern Shawnee Tribe." [Dkt. #23-10, p. 3].

Shortly before checkout on August 15, Nealis prepared to vacate her room. At approximately 11:45 a.m., she gathered her luggage and other personal items and took them to her car. Because she could not carry everything at once, she left her purse in the room, intending to immediately come back to retrieve it. At or shortly after 12:00 p.m., Reba Hernandez, a

housekeeper at the Indigo Sky, entered Nealis's room for routine cleaning.  Upon seeing Nealis's purse, Hernandez exited the room and, in accordance with the hotel's established procedures, contacted her supervisor who, in turn, notified Indigo Sky security.  Security Officer Shawn Orman retrieved the purse and took it to lost and found (in the hotel's security office) at approximately 12:20 p.m.  Once there, Orman opened and looked inside the purse in an effort to identify its owner.  While looking in the purse, he saw baggies containing what he believed were narcotics.  He immediately discontinued his search and contacted the Eastern Shawnee Tribal Police.

Officers Ray Harvey and Kevin Dunkel responded to the call at approximately 12:30 p.m.  Upon their arrival, Orman informed the officers of the foregoing events and advised them that Nealis was at the office and was seeking to claim the purse.  Before speaking with Nealis, the officers inspected the purse.  They observed it sitting open and saw plastic baggies inside containing what appeared to be narcotics.  Officer Harvey then searched the purse (without a warrant) whereupon he discovered a functional set of digital scales, a clear plastic baggie containing several smaller bags, a woman's wallet containing Nealis's driver's license, a black bag containing a glass smoking device, and a clear plastic baggie containing a crystalline substance believed to be methamphetamine.  After searching the purse, Officers Harvey and Dunkel asked Nealis whether the contents of the purse were hers.  She responded in the affirmative.  At that point the officers placed her under arrest and asked if there was anyone she needed to notify.  Nealis responded that a male friend she was with had already taken her silver Chevrolet Impala and left.

Officer Harvey located the Impala in the parking lot.  A license plate check revealed the vehicle was registered to Nealis.  Officer Harvey approached the vehicle and observed a male in

the front passenger seat.  Officer Harvey made contact with Nealis via cell phone and advised her that he had located the male subject and her vehicle still in the parking lot.  He asked her for permission to search the vehicle.  She consented.

Officer Harvey then searched the vehicle and found a small plastic bag of marijuana located under the seat where the male subject was sitting.  Officer Harvey advised the individual that he was under arrest for the marijuana and had him empty his pockets onto the hood of the vehicle.  The male subject removed a large quantity of money, some lighters, a pack of Zig-Zag rolling papers, and two cellular telephones.[1]

On September 3, 2014, Nealis was indicted on one count of possessing methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(c).  Nealis now moves to suppress all evidence obtained during the warrantless search of her purse and vehicle.

## II.  DISCUSSION

Nealis's motion involves several analytic steps.  She first contends that employees of the Indigo Sky (including its housekeeping and security staff) are tribal government officials and thus, under the Indian Civil Rights Act ("ICRA"), are subject to restrictions equivalent to the Fourth Amendment.  Based on this premise, she asserts that housekeeping's entry into her room and security's subsequent inspection of her purse were unlawful searches and that the evidence obtained from her vehicle constitutes fruit of the poisonous tree.  In response, the government contends that Indigo Sky employees do not qualify as tribal government actors under ICRA and, in any event, that Nealis had abandoned her purse by leaving it in her room after checkout time.

---

[1] The facts recited in this section are based on evidence received during an evidentiary hearing held on April 5, 2016, as well as uncontested representations made by the government (in its response brief) concerning events for which neither party has offered evidence.  In particular, the court relies on the government's statement of facts with respect to the events occurring after Officer Harvey located Nealis's vehicle.

In assessing the parties' positions, the court starts with the law applicable to Nealis's motion. Although neither the Bill of Rights nor the Fourteenth Amendment apply, of their own force, to Indian tribes, Congress has by legislation imposed similar limitations on tribal governments. *See* 25 U.S.C. § 1302; *see also United States v. Shavanaux*, 647 F.3d 993, 999 (10th Cir. 2011) ("Even though the Bill of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes, ICRA does apply a number of identical or analogous safeguards to Indian tribes."). Under ICRA, Indian tribes "in exercising the powers of self-government" must accord individuals the same rights as secured under the Fourth Amendment. *See* 25 U.S.C. § 1302(2).[2] Courts have interpreted this provision as including the exclusionary rule. *See State v. Madsen*, 760 N.W.2d 370, 377 (S.D. 2009); *People v. Ramirez*, 148 Cal. App. 4th 1464, 1475 (2007). Under the statute, the phrase

> "powers of self-government" means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians.

25 U.S.C. § 1301(2).

---

[2] Section 1302(2) reads as follows:

> No Indian tribe in exercising powers of self-government shall . . . violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.

25 U.S.C. § 1302(2). Courts have interpreted this language as imposing limitations identical to the Fourth Amendment. *See United States v. Becerra-Garcia*, 397 F.3d 1167, 1171 (9th Cir. 2005); *United States v. Lester*, 647 F.2d 869, 872 (8th Cir. 1981); *State v. Madsen*, 760 N.W.2d 370, 376 (S.D. 2009); *People v. Ramirez*, 148 Cal. App. 4th 1464, 1470-71 (2007).

Here, Nealis contends that the Indigo Sky's employees, including its housekeeping and security staff, are tribal government officials subject to ICRA. In support of this argument, she notes that the Eastern Shawnee Tribe owns and operates the Indigo Sky and has "clothed [it] with all the privileges and immunities of the . . . Tribe." [Dkt. #23-10, p. 3]. In response, the government submits that ICRA only applies to tribal officials exercising "powers of self-government" and that hotel staff does not fall within this definition.

The court agrees with the government. Whatever reach the Fourth Amendment may have with regard to state employees performing nongovernmental functions, ICRA expressly limits its application to tribal actors performing traditional government functions. Hotel staff does not fall within this category. Although there may be circumstances in which a tribal security guard, because of his or her station or specific duties, could be considered as an arm of the tribe's "powers of self-government," such circumstances are not present here. Security Officer Orman was a hotel employee. His duties were no more expansive than that of a private security guard employed at a private establishment. *See Wade v. Byles*, 83 F.3d 902, 906-07 (7th Cir. 1996) (concluding that a private security guard at a residential building owned by the Chicago Housing Authority was a private actor for Fourth Amendment purposes because, among other reasons, he "possessed powers no greater than those of armed security guards who are commonly employed by private companies to protect private property"). Under such circumstances, the court finds that housekeeping's entry into the defendant's room and security's subsequent inspection of her purse were private actions not subject to ICRA.

Alternatively, even if Hernandez and Orman were considered tribal government officials, their conduct did not violate Fourth Amendment standards. Hernandez entered Nealis's room after checkout time. *See United States v. Croft*, 429 F.2d 884, 887 (10th Cir. 1970) ("When the

rental period has elapsed, the guest has completely lost his right to use the room and any privacy associated with it. The manager of the motel may then freely enter the room, rent the room to others, and remove any belongings left in the room."). Nealis had not requested a delayed checkout, and there is no indication that the hotel said or did anything that would have given her a reasonable expectation of privacy in the room after checkout time. *See United States v. Owens*, 782 F2d 146, 150 (10th Cir. 1986) (holding that a hotel guest had a reasonable expectation of privacy in his room after checkout time where the guest reasonably believed that he had paid for his room for another night and the hotel had previously allowed the guest to remain in his room after checkout without consequence); *see also United States v. Lanier*, 636 F.3d 228, 232 (6th Cir. 2011) (noting that a hotel's practices and communications with a guest—such as "giving a guest permission to stay until a later check-out time or generally acquiescing when a guest stays until a later check-out time"—may extend the guest's reasonable expectation of privacy in the room past checkout); *United States v. Dorais*, 241 F.3d 1124, 1128 (9th Cir. 2001) ("[A] guest may retain a reasonable expectation of privacy in a hotel room after checkout time based on the relationship between the guest and the hotel or based on the hotel's generally lax practices in enforcing its checkout time."). Nealis contends that the hotel's written checkout policy gave her a reasonable expectation of privacy in the room until at least 1:00 p.m.[3] The court disagrees. That policy merely states that the hotel reserves the right to charge guests a penalty for failing to

---

[3] The policy reads as follows:

> Our check out time is 12:00 pm. A guest who does not vacate the room by check out time and has not received approval from the front desk is subject to a $30 penalty. If guests do not vacate by 1pm the hotel reserves the right to charge the guest for an additional night's stay.

[Dkt. #23-4, p.1].

vacate a room before checkout. Nowhere does the policy state or suggest that hotel staff will refrain from entering and reclaiming a room after checkout simply because a guest leaves one or more personal belongings in the room.

As for security's inspection of the purse, although the court rejects the government's contention that the purse was abandoned, *cf. United States v. Garzon*, 119 F.3d 1446, 1450 (10th Cir. 1997) (rejecting abandonment argument where defendant did not "manifest objectively an intent to abandon his backpacks"), its status is closely analogous to property categorized as lost or mislaid, *see, e.g.*, *State v. Hamilton*, 67 P.3d 871, 875-76 (Mont. 2003) (rejecting government's argument that accidently losing an item constitutes abandonment); *State v. May*, 608 A.2d 772, 775 (Me. 1992) ("Given that defendant did not intentionally discard his wallet but merely lost it, he did not at that time relinquish his expectation of privacy in it and thereby abandon it."); *State v. Ching*, 678 P.2d 1088, 1092 (Haw.1984) ("Property is lost through inadvertence, not intent. Although owners of lost property must expect some intrusion by finders, common sense dictates that they do not forfeit all expectations of privacy in their property as though they had intentionally abandoned it."). When an individual loses or mislays personal property, his or her "expectation of privacy is diminished to the extent that the finder may examine and search the lost property to determine its owner." *State v. Kealey*, 907 P.2d 319, 326 (Wash. Ct. App. 1995), *as amended on denial of reconsideration* (Feb. 26, 1996); *accord Hamilton*, 67 P.3d 876. That is precisely what Orman did here. For this reason, the court holds that Orman's inspection of Nealis's purse, even if considered government action, was not a "search" within the meaning of ICRA.

Having concluded that security's opening of Nealis's purse did not violate ICRA, the court lastly must address whether Officer Harvey's search of purse was itself unlawful. "A

warrantless search of a legally seized container is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." *United States v. Jackson*, 381 F.3d 984, 989 (10th Cir. 2004).  One such exception is the plain view doctrine.  Under that exception, "[a] warrantless search can be conducted if law enforcement agents see, within plain view, the contents of a container and it is apparent or a 'foregone conclusion' that such contents are contraband." *Id.* (quoting *United States v. Corral*, 970 F.2d 719, 725 (10th Cir. 1992)); *accord United States v. Ross*, 456 U.S. 798, 814 n.19 (1982) ("[I]n some cases the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant." (quoting *Arkansas v. Sanders*, 442 U.S. 753, 764 n.13 (1979))).  Notably, this exception does not automatically permit officers to search a closed container found within the open container.  *See United States v. Donnes*, 947 F.2d 1430, 1438-39 (10th Cir. 1991).  Opening a closed container found within a larger container constitutes a separate search which itself must be justified either by a warrant or an exception to the warrant requirement.  *See id.* at 1436-37; *see also United States v. Davis*, 657 F. Supp. 2d 630, 638 (D. Md. 2009) ("Proximity to a suspicious item alone does not make it a foregone conclusion that a closed container also contains evidence or contraband." (citing *United States v. Bonitz*, 826 F.2d 954, 956 (10th Cir. 1987)).

With these principles in mind, the court concludes that Officer Harvey's search of the purse was lawful, but that his searches of the wallet and black bag found inside the purse were not.  Starting with the purse, Officer Dunkel testified that the purse was open when he and Officer Harvey arrived and that its contents, including what appeared to be narcotics, were plainly visible.  Such circumstances are sufficient to permit a warrantless search of the purse.  These same facts, however, do not justify searching the wallet and black bag found therein.  Those items constitute separate containers the search of which must be justified either by a

warrant or an exception to the warrant requirement.  No such exception is applicable here.  There is no indication that the contents of these separate containers were plainly visible or that opening them was necessitated by exigent circumstances.  Accordingly, Nealis's motion is granted with regard to the contents of these containers.

As for the items obtained from Nealis's car, the court finds that Nealis consented to the search of her vehicle and that her consent was not tainted by the minor extent to which officers' conduct exceeded the Fourth Amendment.  Accordingly, those items are not fruit of the poisonous tree.

WHEREFORE, Nealis's Motion to Suppress [Dkt. #16] is granted in part and denied in part.  The motion is granted with regard to the contents of her wallet and the black bag found inside her purse and denied as to all other items.

IT IS SO ORDERED this 14th day of April, 2016.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT